**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

MARTIN ONKEN,

        Plaintiff,

vs.

McNEILUS TRUCK &
MANUFACTURING, INC.,

        Defendant.

No. 08-CV-2003-LRR

**ORDER**

_____

*TABLE OF CONTENTS*

**I.**     **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

**II.**    **RELEVANT PROCEDURAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . **2**

**III.**   **SUBJECT MATTER JURISDICTION** . . . . . . . . . . . . . . . . . . . . . . . **3**

**IV.**   **STANDARD OF REVIEW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

**V.**    **RESISTANCE MATERIALS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
       *A.*    *Violation of the Local Rules* . . . . . . . . . . . . . . . . . . . . . . **4**
       *B.*    *Affidavits* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

**VI.**   **RELEVANT FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . **6**
       *A.*    *The Parties* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
       *B.*    *Plaintiff's Condition* . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
       *C.*    *Plaintiff's Employment* . . . . . . . . . . . . . . . . . . . . . . . . **7**
       *D.*    *Plaintiff's Condition Affects Him at Work* . . . . . . . . . . . . . **8**
       *E.*    *July Episode* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**
       *F.*    *Evaluation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**
       *G.*   *Defendant Terminates Plaintiff* . . . . . . . . . . . . . . . . . . . **16**
       *H.*   *Plaintiff's Employment & Condition After Termination* . . . . . . . . **17**
       *I.*    *Administrative Proceedings* . . . . . . . . . . . . . . . . . . . . . . **17**

**VI.**   **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**
       *A.*    *Legal Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**
       *B.*    *Summary of Defendant's Arguments* . . . . . . . . . . . . . . . . . . **19**
       *C.*    *Whether Plaintiff is a "Qualified Individual" Under the ADA* . . . . **19**

      *1.    Direct threat: legal background* . . . . . . . . . . . . . . . . . . . . **19**
      *2.    Holding* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**
      *3.    Plaintiff's arguments* . . . . . . . . . . . . . . . . . . . . . . . . . **22**
      *4.    Summary* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**

**VII.   CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**

## I. INTRODUCTION

The matter before the court is Defendant McNeilus Truck and Manufacturing, Inc.'s Motion for Summary Judgment ("Motion") (docket no. 25).

## II. RELEVANT PROCEDURAL BACKGROUND

On November 26, 2007, Plaintiff Martin Onken filed a Petition at Law (docket no. 8) in the Iowa District Court for Howard County. In the Petition, Plaintiff alleged Defendant had violated his rights under the Americans With Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq*. On January 9, 2008, Defendant removed the action to this court.

On February 8, 2008, Plaintiff filed an "Amended Petition at Law" ("Amended Petition") (docket no. 15), which added a state law disability claim under the Iowa Civil Rights Act of 1965 ("ICRA"), Iowa Code Chapter 216. On February 11, 2008, Defendant filed an Answer (docket no. 16) in which it denied the substance of the Amended Petition.

On April 2, 2009, Defendant filed the Motion and requested oral argument. On April 22, 2009, Plaintiff filed a Resistance (docket no. 29). On May 8, 2009, Defendant filed a Reply.

After the parties had completed their briefing, counsel for Defendant informed chambers staff via telephone that the parties had agreed that Defendant could retract its request for oral argument. Defendant's counsel informed chambers staff that she would file a written notice of this retraction. However, Defendant never filed any retraction. In any event, the court finds oral argument on the Motion is unnecessary. The Motion is

fully submitted and ready for decision.

### III. SUBJECT MATTER JURISDICTION

The court holds it has federal question jurisdiction over Plaintiff's ADA claim. *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States"). The court shall exercise supplemental jurisdiction over Plaintiff's state law claim because it is so related to the claim over which the court has federal question jurisdiction that it forms part of the same case or controversy. *See* 28 U.S.C. § 1367(a) ("[T]he district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy[.]").

### IV. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "[T]o establish the existence of a genuine issue of material fact, 'a plaintiff may not merely point to unsupported self-serving allegations.'" *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008) (quoting *Bass v. SBC Commc'ns, Inc.*, 418 F.3d 870, 872 (8th Cir. 2005)). Rather, the nonmoving party "'must substantiate [its] allegations with sufficient probative evidence that would permit a finding in [its] favor.'" *Anda*, 517 F.3d at 531 (quoting *Bass*, 418 F.3d at 873). The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Found. of Am., Inc.*,

450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see, e.g.*, *Baum v. Helget Gas Prods., Inc.*, 440 F.3d 1019, 1022 (8th Cir. 2006) ("Summary judgment is not appropriate if the non-moving party can set forth specific facts, by affidavit, deposition, or other evidence, showing a genuine issue for trial."). The nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "'Evidence, not contentions, avoids summary judgment.'" *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)).

## V. *RESISTANCE MATERIALS*

Defendant argues that the materials Plaintiff filed in support of his Resistance violate the court's Local Rules and are improper. Specifically, Defendant argues Plaintiff (1) violated the court's local rules on summary judgment when responding to Defendant's Statement of Material Facts (docket no. 25-2) and (2) filed improper affidavits.

### A. *Violation of Local Rules*

First, the court finds that Plaintiff's Response to Defendant's Statement of Material Facts ("Response to Statement of Material Facts") (docket no. 29-2) violates the Local

Rules.[1] A resisting party must file "[a] response to the [moving party's] statement of material facts in which the resisting party expressly admits, denies, or qualifies each of the moving party's numbered statements of fact[.]" LR 56.b.2. Plaintiff failed to expressly admit, deny or qualify a great number of Defendant's statements of material fact. *See, e.g.*, Response to Statement of Material Facts at ¶¶ 5, 7, 8 & 10. Instead, Plaintiff rephrased Defendant's statements of material fact, "admitted" the rephrased versions and sought to qualify certain admissions with facts that are either non-responsive or immaterial to the specific facts asserted. Although the rephrased statements could be interpreted to dispute Defendant's statements of material fact, many such disputes are never properly identified, qualified or supported with the required specific citations to the record. *See* LR 56.b ("A response to an individual statement of material fact that is not expressly admitted must be supported by references to [. . .] the pleadings, depositions, answers to interrogatories, admissions, exhibits, and affidavits [. . .] with appropriate citations to the appendix[.]").

Accordingly, to the extent Plaintiff failed to expressly admit or deny any of Defendant's statements of material fact, the court shall deem those facts to be admitted. Similarly, to the extent Plaintiff's "qualifications" to Defendant's Statement of Material Facts contain facts that are non-responsive to the specific fact asserted, the court shall deem the specific fact asserted to be admitted.

### *B. Affidavits*

Defendant argues that Plaintiff submitted the following improper affidavits in support of his Resistance: (1) Affidavit of Martin Onken (Plaintiff's Appendix ("Pl.

---

[1] This is not the first time the court has found that a party represented by Plaintiff's counsel, Judith M. O'Donohoe, violated the court's local rules in a summary judgment proceeding. *See Goings v. Chickasaw County, Iowa*, No. 06-CV-2063-LRR, 2008 WL 686917, at *1-*3 (N.D. Iowa Mar. 10, 2008) (holding Plaintiff's counsel violated the court's local rules in numerous respects in resisting a motion for summary judgment).

App'x") (docket no. 29-4), at 121-34), (2) Affidavit of Molly Onken (*id.* at 135-36A), (3) Affidavit of Dr. Mark C. Johnson, M.D. (*id.* at 137-44); and (4) Affidavit of Steve Geerts (*id.* at 145-46). Defendant variously argues these affidavits are inaccurate, contain facts that are inconsistent with prior sworn testimony and are otherwise improper. However, Defendant fails to point out any specific example of an inconsistency between a witness's affidavit statement and deposition testimony. The court is unwilling to scrutinize and compare each witness's affidavit and deposition testimony to verify Defendant's argument. Additionally, Defendant fails to support these arguments with the necessary evidence. For instance, Defendant argues Mr. Geerts's affidavit is improper because Plaintiff never identified Mr. Geerts as a witness in discovery. However, Defendant does not provide the court with Plaintiff's discovery responses.[2] This prevents the court from deciding whether Plaintiff failed to disclose Mr. Geerts as a witness.

Accordingly, the court shall consider these affidavits to the extent they are necessary to resolve the issues raised in the Motion.

## VI. RELEVANT FACTUAL BACKGROUND

Construing the facts in the light most favorable to the non-moving party, Plaintiff, and affording him all reasonable inferences, the undisputed facts are these:

### A. The Parties

Plaintiff is a resident of New Hampton in Chickasaw County, Iowa. Defendant is a corporation with its principal place of business located in Dodge Center, Minnesota. Defendant is Plaintiff's former employer.

### B. Plaintiff's Condition

Plaintiff has Type I diabetes. Plaintiff's diabetes causes him to have occasional low blood sugar episodes known as hypoglycemia. Plaintiff has had hypoglycemic episodes

---

[2] The only discovery response Defendant provided is a copy of Plaintiff's Initial Disclosures.

since 1985. During a hypoglycemic episode, Plaintiff loses control of his behavior. His hypoglycemic behavior is often unpredictable and can cause him to become angry and aggressive. Plaintiff testified that, although he has never hit anyone, he has occasionally cocked his hand back, made a fist or threatened someone during a hypoglycemic episode. During one hypoglycemic episode, Plaintiff threatened to kill a police officer.

Plaintiff's condition requires him to monitor his blood sugar levels. Plaintiff periodically checks his blood sugar levels throughout the day. However, these blood sugar checks do not necessarily prevent Plaintiff from becoming hypoglycemic. Often, diabetics can detect low blood sugar without a blood sugar reading because they recognize their own physical symptoms of low blood sugar. Russell Gelfman, M.D., one of Plaintiff's physicians from the Mayo Clinic in Rochester, Minnesota, stated that these symptoms include cravings, sweating and shakiness. According to Dr. Gelfman, however, Plaintiff is among a small percentage of diabetics who are often unable to detect a low blood sugar level from their physical symptoms. As a result, diabetics like Plaintiff often do not have advance notice or warning of an imminent hypoglycemic episode. As a result, diabetics like Plaintiff are often unable to take preventive measures to avoid becoming hypoglycemic.

### C. Plaintiff's Employment

In March of 1999, Plaintiff began to work full-time for Defendant as a welder at Defendant's plant in Riceville, Iowa (the "Plant"). Plaintiff's primary job at the Plant required him to weld small parts for vehicle tailgates and discharge hoppers. Plaintiff's work required him to use a welding lead; that is, an insulated copper cable that carries electrical current for the welding process. Unless Plaintiff suffered from a hypoglycemic incident at work, Plaintiff was productive, efficient and had a good attendance record. Although he checked his blood sugar levels while working, these checks did not affect his productivity.

The risks the equipment and work at the Plant posed were "potentially dangerous" to a person who was unaware of them. Defendant's Supplemental Appendix ("Def. App'x II") (docket no. 34-3), at 330. The equipment used on the production floor, such as cranes, welding machines, welding arcs, hot metal, torches and fork lifts, created a potential danger for employees. The Plant's safety supervisor, Brian Stevenson, stated that if someone had poor balance and was staggering, he would not allow that person on the production floor because it would be unsafe.

Defendant employs several other diabetic employees. These other employees have not experienced problems controlling their condition and have not posed a threat to their own safety or the safety of others at the Plant.

### D. Plaintiff's Condition Affects Him at Work

Plaintiff had diabetes throughout his employment with Defendant. Although the Plant never held any meetings with Plaintiff's co-workers to discuss Plaintiff's condition, Plaintiff's co-workers were aware of his condition. Often, one of Plaintiff's colleagues, Stan Lubbert, an EMT, could determine when Plaintiff was having a hypoglycemic episode and talk him into walking to the break room to have a snack and help him recover from a hypoglycemic episode. Defendant allowed Plaintiff to check his blood sugar "whenever he needed to" and encouraged him "to take breaks to consume a sugar source or to check his blood sugar level outside of his normal breaks or lunch if it was necessary." Pl. App'x at 158.

The record reflects that Plaintiff's condition first materially affected his ability to work on March 19, 2001. On that date, Plaintiff had a hypoglycemic episode at work. Plant management sent Plaintiff home.

On February 7, 2003, Plaintiff had another hypoglycemic episode at work. Plant management arranged for Plaintiff to be transferred to a hospital by ambulance to receive treatment for his hypoglycemia. Afterwards, Defendant's Certified Occupational Health

Nurse, Mary Adam, spoke with Plaintiff about regulating his blood sugar levels. Adam asked Plaintiff to check his blood sugar more often. Adam also asked him to consume additional food or drink during the work day at times outside of his normal break schedule. Plaintiff agreed to both requests. Adam worked with Plaintiff to help him control his hypoglycemia, but he continued to have hypoglycemic episodes.

On September 16, 2005, Plaintiff had another hypoglycemic episode. In the medical records from Plaintiff's hospital stay, Plaintiff's physician reports:

> Out of the blue this morning at work [at the Plant], [Plaintiff] became poorly responsive. Co-workers gave him some Mountain Dew and the ambulance was called. Blood sugars have been running a little high, although last evening, blood sugar was 63. He did take a snack and this morning, before breakfast, it was 97, which is not terribly unusual for him. He ate his normal breakfast and had his normal Insulin. He has a notorious history of being quite unpredictable with his blood sugar levels. He eats snacks. He checks his blood sugar quite frequently and in spite of this, he continues to have highs and lows. By the time he got to the hospital, he was feeling relatively normal.
>
> * * *
>
> PLAN: We will give him breakfast this morning. He will watch his sugars more closely over the next few days. Given his history, I don't think major adjustments would be fruitful.

Defendant's Appendix ("Def. App'x I") (docket no. 25-4), at 69 (emphasis in original).

On September 28, 2005, the Plant's safety manager, Matt Maas, sent Plaintiff a letter. In the letter, Mr. Maas stated that the Plant's management was concerned for Plaintiff's safety "as a result of the episodes in which [he] ha[d] become incoherent while at work." *Id.* at 106. Mr. Maas asked Plaintiff to obtain a release from his physician before returning to work.

Plaintiff obtained a release from his physician, Dr. Tracy M. Mixdorf, D.O., from the Mercy Medical Center in New Hampton, Iowa. Dr. Mixdorf stated that Plaintiff could

return to work as usual as long as he did not have to drive a forklift. Plaintiff did not drive a forklift at the Plant. Dr. Mixdorf rendered this opinion while under the mistaken assumption that the equipment Plaintiff used at work had automatic safety shut-offs that would prevent Plaintiff and his co-workers from injury.

On December 21, 2005, Plaintiff had another low blood sugar episode at work. On January 10, 2006, Defendant's Human Resources director, Terry Eckstein, sent Plaintiff a letter in response to this incident and stated:

> One of the witnesses to your behavior found you sitting on a welder and laughing. The witness also reported that you had poor balance. An ambulance was called for you, and prior to its arrival you were given soda as well as a tube of glucose since it was thought that your behavior was due to a low blood sugar level.
>
> Since this is not the first time an incident like this has occurred, we are very concerned for your safety and the safety of your coworkers when these incidents occur. We do not want to lose you as an employee, but we do need to address the safety issues.
>
> * * *
>
> I have asked [Adam], to visit with you and develop a plan that will allow you to control your blood sugar levels at work. I am confident that if you work with [Adam] and we are able to be assured of your safety and the safety of your coworkers, we will be able to continue your employment with [Defendant]. If our efforts are unsuccessful, we will have no choice but to separate you from service.

*Id.* at 23.

Plaintiff met with Adam, who found that Plaintiff was willing to listen and talk. Subsequently, in February of 2006, Plaintiff participated in a three-day inpatient diabetes education program at Mayo Clinic. Plaintiff attended this program with his wife, Molly Onken.

On May 5, 2006, Defendant sent Plaintiff home from work due to a low blood sugar

reading and asked him to obtain a physician's release before returning to work. Plaintiff obtained the necessary release and returned to work on Monday, June 6, 2006.

Plaintiff also testified about another hypoglycemic incident at the Plant involving a supervisor, Danny Rogers.[3] During that episode, Plaintiff grabbed hold of a hook suspended from a crane on the Plant floor and swung from it. When Mr. Rogers approached Plaintiff, Plaintiff "told him [he] was going to kick his behind." Def. App'x II at 300. Then, Plaintiff "went over and g[a]ve him a big hug[.]" *Id.*

### E. July Episode

On July 18, 2006, Plaintiff had another hypoglycemic episode at work ("July Episode"). The Plant's supervisor, Michael Heffron, wrote an incident report ("Incident Report") (Def. App'x I at 25-26) about the July Episode. The following summary of the July Episode consists of the uncontested portions of the Incident Report and deposition testimony of witnesses to the July Episode.

Around 9:00 a.m., several employees noticed that Plaintiff was staggering and red-faced near his work station.[4] After an employee asked Plaintiff how he was feeling, Plaintiff "picked up a hammer and struck the bench with it very hard," then fell backwards. *Id.* at 25.

Nancy Kephart, a co-worker and paramedic, approached Plaintiff from behind and said, "Hey Marty." Pl. App'x at 175. Plaintiff "turned around, and [. . .] he kind of cocked [his arm] back." *Id.* Kephart stepped back. Plaintiff "kind of laughed and said,

---

[3] The date of this hypoglycemic incident is not set forth in the record.

[4] The Incident Report also states that Plaintiff "picked up a welding lead and started twirling it like a lasso, then [. . .] slammed it on the workbench" and that he was swinging his welding lead. *Id.* at 25. However, in their depositions, the witnesses to whom the Incident Report attributes this information did not recall Plaintiff doing either of these things. Viewing the facts in the light most favorable to Plaintiff, the court assumes that this did not occur and only bases its analysis on the uncontested portions of the Incident Report.

'You scared?'" then lowered his hand.  *Id.*

After this interaction with Kephart, Heffron approached Plaintiff and said his name out loud.  Plaintiff "spun around quickly and had his left arm back as if he was going to hit [Heffron]."  Def. App'x I at 25.  When Plaintiff recognized Heffron, he said, "Mikey!" and lowered his arm.  *Id.*  Heffron then encouraged Plaintiff to go to the break room, to which Plaintiff responded, "Fuck you[,] I ain't going anywhere."  *Id.*  Then, Plaintiff took off running.

Plaintiff ran to the restroom and locked the door.  Plaintiff refused to leave the restroom.  When his co-workers asked him to leave the restroom, Plaintiff yelled, "Fuck you!  I'm taking a crap!  Leave me alone!"  *Id.* at 26.  At this point, Heffron asked a co-worker to call an ambulance.  After twenty-five minutes, Plaintiff left the restroom and walked into the break room while screaming and yelling.  Plaintiff "took off his hard hat and slammed it onto a break room table."  *Id.*  Heffron asked Plaintiff whether he wanted a pop and Plaintiff yelled, "Fuck no!  Leave me alone!"  *Id.*

Then, Kephart tried to have Plaintiff ingest some of the glucose contained in a tube she was holding.  Plaintiff reacted by "angrily sw[ingin]g his hand toward her [and] knocking the glucose out of her hand and across the break room."  *Id.*  With convincing from Lubbert, Plaintiff consumed a can of non-diet soda, a banana and several fruit-filled cookies.  After eating, Plaintiff voluntarily checked his blood sugar level, which was at 48, a "[c]onsiderably low" blood sugar level.  Pl. App'x at 180.

Plaintiff left work in the ambulance Heffron had called.  The ambulance crew wanted Lubbert to accompany Plaintiff to the hospital because they were concerned that they would be unable to control Plaintiff by themselves.  Plaintiff also appears to have wanted Lubbert to go to the hospital with him.  Accordingly, Lubbert accompanied Plaintiff to the hospital in the ambulance.

As a result of this episode, Kephart and Heffron felt that it may be unsafe for

Plaintiff to continue working at the Plant because his low blood sugar episodes created safety issues. The Incident Report and Heffron's deposition testimony also reflect that Plaintiff had been suffering from approximately one low blood sugar episode each week several months prior to the July Episode.

In the Incident Report, Heffron concluded:

> Whenever [Plaintiff] has had a diabetic episode, I have known that he was at risk and those around him COULD have been. This is the first time I can honestly say that I KNOW those around him were at risk. [Plaintiff] was very aggressive. [Plaintiff] displayed a very aggressive-angry-in-your-face type of behavior. I will admit that I was concerned. One could not predict what his next action would be.
>
> * * *
>
> [Plaintiff] is not like this as a human being, but the diabetic[-] related behavior displayed this morning could be best described as intimidating and nerve-rattling and I believe we are all fortunate that nothing bad happened as a result.

Def. App'x I at 26 (emphasis in original).

Kephart agreed that Plaintiff's condition posed a safety risk. However, Lubbert and a few of Plaintiff's other co-workers did not feel that Plaintiff's condition created any danger to others.

### F. Evaluation

Following the July Episode, Defendant placed Plaintiff on leave. Adam arranged for Plaintiff to complete a fitness for duty evaluation ("Evaluation"), which was comprised of a series of questions Defendant posed to an evaluating physician, Dr. Gelfman. On August 22, 2006, Dr. Gelfman completed the Evaluation and concluded:

> The reasons for [Plaintiff's] episodes of hypoglycemia are not clear based on a review of his medical records and my interview with him. As long as his blood sugars remain in a reasonable range, he has no limitations in his ability to concentrate.

\* \* \*

> Based on his presentation here in the office, [Plaintiff] would not be a risk to himself or others if he was able to manage his underlying medical condition without having hypoglycemic episodes. He appears to be unable to appropriately determine when he is becoming hypoglycemic and to take appropriate action. For this reason, I have specifically recommended that he check his blood sugars more frequently than prior to every meal in the short term and that he have a follow-up with [. . .] a Mayo Clinic endocrinologist [. . .] to discuss whether other options are available to minimize his hypoglycemic episodes.

\* \* \*

> I believe that [Plaintiff] possesses the mental acuity necessary to perform his current job as long as he does not have hypoglycemic episodes. Therefore, whether [Plaintiff] can continue to work at his present job is entirely dependent on his ability to avoid hypoglycemia. I believe it is worthwhile for him to follow up with [. . .] his endocrinologist[] to see if there are any additional recommendations to allow him to attain this goal.

\* \* \*

> I believe that [Plaintiff] can return to his regular job duties at this time as long as he follows my recommendations to check his blood sugars more frequently and in particular check it around 8[:00] or 8:30 in the morning instead of waiting until his snack time at 9:30 a.m. If specific difficulties with regards to concentration or alertness are seen at other times of the day, additional testing times would be recommended. It is unlikely he will be able to continue to check his blood glucose this frequently on a long-term basis[.]

*Id.* at 31-32.

In response to Defendant's question about whether Plaintiff would be able to return to work, Dr. Gelfman answered: "Yes, if he monitors his blood sugars more frequently[,] such as every two hours[,] while at work. I believe that if he avoids becoming severely hypoglycemic[,] he has the mental capacity to treat a slightly low blood glucose reading." *Id.* at 32. However, Dr. Gelfman added that, after Plaintiff becomes hypoglycemic, he

no longer has the ability to treat his low blood sugar. Dr. Gelfman noted that Plaintiff "lacks the ability to determine when these episodes are coming on with the immediacy necessary to take corrective action." *Id.* When asked whether Plaintiff's violent outbursts could be controlled or predicted, Dr. Gelfman answered: "This will depend upon further recommendations from his endocrinologist." *Id.* Finally, Dr. Gelfman concluded: "Hypoglycemia can impair an individual's ability to make appropriate or sound judgments; therefore, if he continues to have episodes of hypoglycemia[,] it is reasonable to opine that he is a risk to himself and possibly to others." *Id.* at 33.

Dr. Gelfman's notes from the Evaluation contain the following conclusions:

> From a purely physical standpoint, [Plaintiff] would be capable of performing the normal duties of his job as a welder at [the Plant]; however, he has poor glycemic control as documented by frequent low blood glucose readings and current hemoglobin A1C of 8.3 percent. This is despite educational intervention. Furthermore, he has poor insight at the time he is experiencing a hypoglycemic episode. He readily admits that he keeps something in his toolbox near his work bench such as a candy bar for when he has an episode; however, when an episode occurs, he sometimes does not feel like opening the toolbox and getting out the candy bar for reasons that may relate to his mental status changes. He has had to have emergency personnel come to the workplace. There is a concern about his safety as well as the safety of co-workers and he has slapped glucose from the occupational health nurse attempting to treat him at work. For this reason I have recommended that he be allowed to return to work at this time only if he check a blood glucose reading sometime around 8[:00] or 8:30 in the morning, as he believes this is the time when he tends to get low most frequently, although episodes have happened at other times. I have also asked him to set up a follow-up appointment with [his endocrinologist]. Specifically, he needs to discuss whether any other alternatives are available to him.
>
> * * *
>
> If he cannot return to his previous state of stability with

regards to mental status, then I believe that there is reasonable
medical evidence that he is disabled from safely performing
the essential job functions of his current job.

*Id.* at 99.

### G. *Defendant Terminates Plaintiff*

After reviewing the Evaluation, Adam and Tracey Rymer, Defendant's Director of
Human Resources, decided to terminate Plaintiff's employment.  Rymer believed that
Plaintiff should have monitored and tested his own blood sugar more often.  Rymer
believed that, if Plaintiff monitored his condition and took corrective action, his work
situation would have improved.  Rymer believed that nothing further could be done to
improve Plaintiff's situation.  Rymer did not believe Plaintiff was capable of performing
any other job at the Plant because of his frequently recurring hypoglycemic episodes.

On September 21, 2006, Rymer sent a letter ("Letter") to Plaintiff.  In the Letter,
Rymer acknowledged the conclusions Dr. Gelfman made in the Evaluation.  Rymer stated:

Dr. Gelfman feels that you have work capabilities based on
your ability to control hypoglycemia.  We have worked
together over the past several years in attempts to accomplish
[this] goal.  As you recall, all of these efforts have been
unsuccessful.

If you have additional ideas for accommodations through your
actions[] which could solve your problems with hypoglycemia,
we would consider them.
                                    * * *
If you have no further comments or ideas on accommodations,
please consider [the Letter] as notification that we have
terminated your employment.

*Id.* at 35.  Rymer directed Plaintiff to contact Adam with ideas for accommodations "as
soon as possible."  *Id.*  The parties agree that Plaintiff's termination was effective as of
September 21, 2006.

Plaintiff contacted Adam and suggested that Defendant could accommodate his

16

diabetes by allowing him to test his blood sugar level more frequently. Adam responded to this idea as follows: "[A]s we both recall[], this is an idea that we have tried in the past. It is unfortunate that our joint efforts have been unsuccessful." *Id.* at 37.

### H. Plaintiff's Employment & Condition After Termination

On January 5, 2007, Plaintiff began to work as a welder for New Hampton Metal Fab ("NHMF"). During his employment with NHMF, Plaintiff suffered three hypoglycemic episodes for which he sought medical attention.

One of Plaintiff's supervisors at NHMF, Gary Adams, testified about Plaintiff's continuing hypoglycemic incidents at NHMF. Adams stated that, at first, Plaintiff told him that his condition "was under control and it wasn't a problem," but then, "something happened, and everything about it seemed to change." Def. App'x II at 333. Adams commented that Plaintiff "had some real tough times for a couple of months." *Id.* Adams told Plaintiff that he needed to see a specialist or he would tell his wife about his hypoglycemic episodes at work. Then, Plaintiff "took it serious, and he got it taken care of, no more problems." *Id.*

### I. Administrative Proceedings

On March 12, 2007, Plaintiff filed charges of employment discrimination with the Iowa Civil Rights Commission ("ICRC") and the Equal Employment Opportunity Commission ("EEOC") against Defendant. Plaintiff alleged Defendant had discriminated against him on the basis of age and disability. On July 2, 2007, the ICRC issued a case determination and concluded that Defendant had provided "a legitimate, non-discriminatory explanation for [its] actions[.]" Def. App'x I at 54. The ICRC also concluded that Plaintiff's condition did not fit the definition of a disability and that Defendant had fulfilled its duty to offer Plaintiff a reasonable accommodation for his

disability.  On August 28, 2007, the EEOC issued Plaintiff a right-to-sue letter.[5]

## VII.  ANALYSIS

### A.  Legal Background

Plaintiff raises claims of disability discrimination under the ADA and ICRA. Where, as here, the parties do not dispute the application of the federal analysis, "disability claims under the ICRA are generally analyzed in accord with the ADA." *Gretillat v. Care Initiatives*, 481 F.3d 649, 652 (8th Cir. 2007) (citing *McElroy v. State*, 703 N.W.2d 385, 391 (Iowa 2005)).  Accordingly, the court analyzes Plaintiff's ICRA claim in accord with the ADA.

"The ADA prohibits employer 'discriminat[ion] against a qualified individual with a disability because of the disability of such individual in regard to [. . .] the hiring, advancement, or discharge of employees[.]'" *Id.* (quoting 42 U.S.C. § 12112(a) (2006)). "The core of every ADA disability definition involves a physical or mental impairment that substantially limits one or more major life activity." *Id.* (citing 42 U.S.C. § 12102(2)).

To establish a prima facie case under the ADA, Plaintiff "must show that he was a disabled person within the meaning of the ADA, that he was qualified to perform the essential functions of the job, and that he suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination." *Kozisek v. County of Seward, Neb.*, 539 F.3d 930, 934 (8th Cir. 2008) (citing *Miners v. Cargill Commc'n, Inc.*, 113 F.3d 820, 823 (8th Cir. 1997)).  "[T]he ADA defines a disability as: (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *Christensen v. Titan Distrib., Inc.*, 481 F.3d 1085, 1093 (8th Cir. 2007) (internal quotation marks omitted).

After a plaintiff has satisfied his or her prima facie case, "the burden of production

---

[5] The EEOC's right-to-sue letter is not contained in the parties' appendices.

shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions." *Kozisek*, 539 F.3d at 935 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). After the employer has shown a legitimate, nondiscriminatory reason for its actions, "[t]he burden of production then shifts back to the plaintiff to demonstrate that the employer's proffered reason is a pretext for unlawful discrimination." *Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-08 (1993)).

### B. Summary of Defendant's Arguments

Defendant argues that the court should grant the Motion because (1) Plaintiff is not a "qualified individual" with a disability as defined by the ADA; (2) Plaintiff does not have a "disability" as defined by the ADA; and (3) there were no reasonable accommodations available to allow Plaintiff to continue working for Defendant as a welder without posing a significant safety risk to others.

### C. Whether Plaintiff is a "Qualified Individual" Under the ADA

Defendant argues Plaintiff is not a "qualified individual" under the ADA. Defendant argues that Plaintiff's condition posed a "direct threat" to his own safety and the safety of others at the Plant, which removes him from the ADA's definition of a "qualified individual." Defendant claims that, as a result, Plaintiff is not eligible for protection under the ADA.

#### 1. Direct threat: legal background

"ADA protection extends only to a qualified individual with a disability, namely, 'an individual with a disability who, with or without reasonable accommodation, [. . .] can perform the essential functions of the employment position that such individual holds or desires.'" *Peyton v. Fred's Stores of Ark., Inc.*, 561 F.3d 900, 902 (8th Cir. 2009) (quoting 42 U.S.C. § 12111(8)). "[A]n individual may not be qualified for a position if that individual poses a 'direct threat' to the health or safety of others[.]" *Burroughs v. City of Springfield*, 163 F.3d 505, 508 (8th Cir. 1998) (citing 42 U.S.C. § 12113(b)). "[T]he

employer bears the burden of proof [on direct threat] as the direct threat defense is an affirmative defense." *EEOC v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 571 (8th Cir. 2007) (citing *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir. 1999)). "The term 'direct threat' means a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). "The existence, or nonexistence, of a significant risk must be determined from the standpoint of the person who refuses the treatment or accommodation, and the risk assessment must be based on medical or other objective evidence." *Bragdon v. Abbott*, 524 U.S. 624, 649 (1998); *see also New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 305 (3d Cir. 2007) (noting *Bragdon* emphasized that the "significant risk test requires a rigorous objective inquiry.").

> The determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include:
>
> (1)  The duration of the risk;
>
> (2)  The nature and severity of the potential harm;
>
> (3)  The likelihood that the potential harm will occur; and
>
> (4)  The imminence of the potential harm.

29 C.F.R. § 1630.2(r). "The Supreme Court requires an individualized direct threat analysis that relies on the 'best current medical or other objective evidence' in order to 'protect disabled individuals from discrimination based on prejudice, stereotypes, or unfounded fear.'" *Wal-Mart*, 477 F.3d at 571 (quoting *Nunes*, 164 F.3d at 1248).

## 2.    *Holding*

The court holds that Plaintiff's condition posed an objective, direct threat to the health and safety of other employees at the Plant.  Various dangers were present on the production floor, such as welding arcs, cranes, hot metal, sparks, torches and fork lifts.  The Plant was full of dangers to a person who is unable to control his or her actions, and Plaintiff admits that when he is hypoglycemic, he is unable to control his actions.  For instance, Plaintiff was observed staggering near his work station on the Plant floor.  The Plant's safety supervisor testified that he would not permit such a person on the production floor because that person's presence would be potentially dangerous to others.  Plaintiff has also admitted that he occasionally suffers from seizures or loses consciousness when he becomes hypoglycemic.  Plaintiff's medical records suggest that, even after his termination from the Plant, he continued to have profound hypoglycemic episodes.  If such an incident occurred while Plaintiff was welding, it could pose a direct threat to the safety of others.

Plantiff's hypoglycemic conduct during the July Episode highlights other potential direct risks to the safety of others.  During the July Episode, Plaintiff acted very aggressively toward two Plant personnel when he cocked his arm back as if he intended to hit them.  When Kephart approached him and tried to encourage him to ingest glucose, Plaintiff hit her hand and knocked the tube of glucose away.  Plaintiff yelled at his co-workers and used profanity throughout the July Episode.  At one point, Plaintiff took off running from his workstation, which is an objectively dangerous risk in the Plant's work environment.  Even the ambulance drivers felt threatened by Plaintiff's conduct, and they requested that Lubbert accompany them to the hospital to help manage Plaintiff's behavior.

Other courts have held that employees who fail or are unable to monitor or control their diabetes could cause great injury to others if extreme blood sugar fluctuations occur in a working environment with dangerous machinery.  For instance, in *Darnell v.*

*Thermafiber, Inc.*, the Seventh Circuit Court of Appeals affirmed the district court's decision dismissing the plaintiff's ADA claim and held that his uncontrolled diabetes created a threat to workplace safety:

> It is uncontested that blood sugar levels can fluctuate dramatically when diabetes goes unregulated. As [plaintiff's expert medical witness] himself testified, this can cause unconsciousness, confusion, and impaired judgment. Were [plaintiff] to experience such symptoms at [the employer's plant], the injury to himself or others could be great. [Employer's plant] employees are required to climb tall ladders, operate dangerous machinery—including saws, balers, conveyors, exhaust fans, ovens, and recycling machinery—and help lift 80-pound pieces of fiber board.

417 F.3d 657, 661 (7th Cir. 2005); *see also Burroughs*, 163 F.3d at 506 (affirming summary judgment in case where a police recruit "suffered two diabetic hypoglycemic episodes, causing him to become disoriented and dysfunctional while on duty[] and necessitating emergency medical care").

### 3. *Plaintiff's arguments*

Plaintiff argues that the only evidence showing Plaintiff posed a direct threat is contained in the Incident Report and that the Incident Report has been impeached entirely by the deposition testimony of Steine and Block. The court disagrees. First, evidence of other incidents, such as Plaintiff's hypoglycemic episode during which he swung from a hook suspended from a crane, demonstrate that Plaintiff's condition posed a direct threat to the safety of others at the Plant. Furthermore, the court's analysis of the facts contained in the Incident Report does not include facts that Plaintiff contests. In other words, the court has not considered the portions of the Incident Report attributed to Steine and Block that are disputed by Steine or Block. The court credits the Incident Report to the extent it attributes uncontested facts to other witnesses, such as Kephart and Heffron.

Plaintiff argues that a number of Plant employees testified that they did not fear that

Plaintiff posed a direct threat to their safety. This argument misses the point. "The existence, or nonexistence, of a significant risk must be determined *from the standpoint of the person who refuses the treatment or accommodation*[.]" *Bragdon*, 524 U.S. at 649 (emphasis added). In this case, Adam and Rymer—not his co-workers—determined the risk.

Plaintiff also argues that neither Adam nor Rymer analyzed Plaintiff's condition in accordance with 29 C.F.R. § 1630.2(r). Specifically, Plaintiff argues Nurse Adam and Ms. Rymer failed: (1) to base their decision on reasonable medical judgment because the Evaluation is inconsistent with their conclusion and (2) failed to consider the factors set forth in 29 C.F.R. § 1630.2(r). Plaintiff is incorrect.

First, Adam and Rymer correctly performed an individualized assessment of the factors contained in § 1630.2(r). They based their decision on facts contained in the Incident Report as well as the thorough Evaluation. This information satisfied the § 1630.2(r) factors.

Second, the decision that Plaintiff posed a serious safety risk is supported by objective medical evidence, namely, the Evaluation. Plaintiff disagrees and contends that Dr. Gelfman's conclusions in the Evaluation indicate that Plaintiff should have been allowed to return to work and perform more frequent blood checks. Plaintiff mischaracterizes the Evaluation. The Evaluation states that Plaintiff "would not be a risk to himself or others *if he was able to manage his underlying medical condition without having hypoglycemic episodes*." Def. App'x I at 31 (emphasis added). Dr. Gelfman concluded Plaintiff was "unable to appropriately determine when he is becoming hypoglycemic and [. . .] take appropriate action." *Id.* Dr. Gelfman also remarked that, "whether [Plaintiff] can continue to work at his present job is entirely dependent on his ability to avoid hypoglycemia." *Id.* at 32. Finally, Dr. Gelfman concluded: "Hypoglycemia can impair an individual's ability to make appropriate or sound judgments;

therefore, if he continues to have episodes of hypoglycemia[,] it is reasonable to opine that he is a risk to himself and possibly to others." *Id.* at 33.

In summary, the Evaluation clarifies that, unless Plaintiff was able to control his hypoglycemic episodes, he would pose a direct safety threat to others at the Plant. Furthermore, throughout the Resistance, Plaintiff insists that his termination was unfair because he was unable to control his condition. *See* Resistance Br. at 16 (arguing Defendant "based its decision to terminate [Plaintiff] on an archaic or misperceived understanding of the fact that his diabetic low blood sugars were controllable by him where they were not").[6] The evidence in the record also shows that Adam's and Plaintiff's repeated efforts to control Plaintiff's hypoglycemia with additional blood sugar readings and snacks did not prevent Plaintiff from becoming hypoglycemic. This, along with the Evaluation, demonstrate that Plaintiff posed a direct risk to the safety of others at the Plant. Therefore, Plaintiff is not "qualified" under the ADA.

Plaintiff tries to minimize his aggressive behavior by arguing that he rarely exhibited aggressive behavior at work and that it only occurred once in 2005 and once during the July Episode. Plaintiff argues that the nature and severity of the potential harm was "minimal." Pl. Br. at 19. The court disagrees with this characterization. As the undisputed facts demonstrate, Plaintiff's condition presented a clear danger of serious harm to others at the Plant.

Plaintiff also argues that Defendant terminated his employment based on the misunderstanding that Plaintiff was able to control his diabetes but failed or refused to do so. Plaintiff misses the point. The record clearly indicates that Defendant terminated Plaintiff because he could not control his condition, which led to hypoglycemic episodes

---

[6] Curiously, Plaintiff later takes the opposite position and argues that he *could* control his diabetes: "[A]n additional check of his blood sugar in the early morning would be sufficient to avoid the few low blood sugar episodes that he has experienced while at work." *Id.* at 26. Plaintiff cannot have it both ways.

such as the July Episode—not because Defendant believed Plaintiff was refusing to follow his physician's advice or treat his condition.

### 4. *Summary*

In conclusion, the court finds that Plaintiff presented a direct threat to the safety of others at the Plant. Therefore, Plaintiff is not a "qualified individual" with a disability as defined by the ADA and is not eligible for ADA protection. The court shall grant the Motion on this basis and dismiss the Amended Petition. Accordingly, the court need not analyze the other two bases for dismissal discussed in the Motion.

## VIII. CONCLUSION

In light of the forgoing, the Motion (docket no. 25) is **GRANTED** and the Amended Petition (docket no. 15) is **DISMISSED WITH PREJUDICE**. The trial presently scheduled to commence at some time during the two-week period beginning on August 17, 2009 is **CANCELED**. The Clerk of Court is **DIRECTED** to close this case. Plaintiff shall pay Defendant's ordinary costs.

**IT IS SO ORDERED.**

**DATED** this 10th day of July, 2009.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA